# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 24, 2009

## STATE OF TENNESSEE v. JULIUS W. WEAVER

**Direct Appeal from the Circuit Court for Rhea County**
**No. 16848     Buddy D. Perry, Judge**

---

**No. E2009-00959-CCA-R3-CD - Filed October 15, 2010**

---

Appellant, Julius W. Weaver, was indicted by a Rhea County Grand Jury on three counts of aggravated sexual battery. On count one of the indictment, he was convicted of the lesser included offense of Class B misdemeanor assault. The jury found him not guilty on counts two and three. The trial court sentenced Appellant to six months incarceration. He now appeals the length and manner of service of his sentence. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Larry G. Roddy, Sale Creek, Tennessee, for the appellant, Julius W. Weaver.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; James Michael Taylor, District Attorney General; and James W. Pope, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The victim in this case was an eleven-year-old girl who lived next door to the sixty-eight-year-old Appellant. The victim often played at Appellant's house; she and Appellant's adopted six-year-old daughter were good friends.

The victim's mother, Janet Daniels, was the first witness to testify at Appellant's trial. She explained that the victim was eleven years old at the time of the crime and that she had

a six-year-old brother. The family lived next door to Appellant; the two houses were separated by a field. The victim was a good friend of Appellant's daughter and often walked across the field to play at Appellant's house.[1] The victim and her brother went to Appellant's house on May 15, 2007. Ms. Daniels testified that the victim returned from Appellant's house approximately thirty minutes later and that she was "excited and frightful." She told Ms. Daniels what had occurred, and Ms. Daniels then reported the incident to the police.

The victim, who was thirteen years old at the time of trial, testified that she was born on August 10, 1995. In May 2007, she was eleven years old and in the fifth grade. She was a friend of Appellant's daughter, who was six years old at the time.

The victim testified that she and her brother went to Appellant's house after school on May 15, 2007, to play with his daughter. Appellant's daughter was not home, but the victim and her brother stayed and played outside Appellant's house.

The victim testified that while she was playing, Appellant told her to come to where he was sitting. According to the victim, Appellant was drinking a beer. When she walked over, Appellant "got [her] and he pulled [her] up . . . to his lap and then he started getting his hand and putting it down . . . on [her] private over [her] clothes at first." Appellant "rubbed" between the victim's legs and asked if it felt good. She said no. Appellant got up, went to his truck, got another beer, and sat down on the truck. While sitting on the truck, Appellant took the victim's hand and placed it on his penis, over his clothes. Again, Appellant asked if it felt good, and again the victim said no. Appellant returned to the chair and pulled the victim onto his lap a second time. He put his finger on her genitals, under her clothes, and started to rub her again. He asked a third time if it felt good; for the third time she said no. The victim tried to get away, but Appellant would not let her. He had one hand on her stomach and one hand down her pants. She eventually freed herself and went home to tell her mother. The victim's brother was at Appellant's house the entire time, but the victim did not think he saw the Appellant touch her.

Rocky Potter, a child abuse investigator with the Rhea County Sheriff's Department, testified that he had been with the department for twenty-two years. He had worked on child abuse cases for seven years.

---

[1] There are conflicting statements in the record about Appellant's relationship with his adopted daughter. There is some testimony that she is Appellant's wife's granddaughter. Other testimony states that she is Appellant's wife's great-granddaughter. Regardless, the evidence is consistent that Appellant and his wife adopted the child well before the events leading to this case. We thus refer to her as Appellant's daughter.

Officer Potter was called to the victim's house on May 15, 2007. He testified that he spoke with the victim and her mother for approximately fifteen to twenty minutes. While they talked, Appellant watched them from across the field.

After leaving the victim's house, Officer Potter, accompanied by Rhea County Sheriff's Department Corporal Gregg Roberson, went next door to interview Appellant. They were met at the door by Appellant's wife, Faye Weaver, and she allowed them to come into the house. Appellant was inside the house.

Officer Potter spoke with Appellant and read him his <u>Miranda</u> rights. Officer Potter testified that Appellant appeared to understand his rights and appeared to have no difficulty communicating with the officers. He signed a form waiving his <u>Miranda</u> rights, and Corporal Roberson signed the form as a witness. After Appellant signed the waiver, Corporal Roberson went into the next room with Ms. Weaver.

Officer Potter testified that Appellant gave a statement regarding the victim's allegations. At Appellant's request, Officer Potter transcribed the statement as Appellant spoke. Officer Potter never asked if Appellant could read or write. In the statement the Appellant said:

> [The victim and her brother] came over around supper time. She was working a puzzlebook and [Appellant] was working on a mower. [The victim] plays with [Appellant's] adopted daughter. . . . [The victim] sat in [Appellant's] lap as he helped her work a puzzle. [Appellant] put his hand on her crotch area on top of her pants, she wiggled her way to the ground and [Appellant] picked her back, up onto his lap, he started rubbing her belly and he asked her if she liked it, she said it felt good, he was trying to teach her not to let people do things like this, she seemed to like it to much, her parents need to talk to her. [Appellant] then put his hand down her pants on bare skin and touched her vaginal area, [Appellant] stated [<u>Appellant</u>] <u>did</u> not put his finger in her and [Appellant] is not a pervert. [Appellant] stated [the victim] and [her brother] played on a clothes line for a while, then [Appellant's] wife came home and the kids ran towards their yard, and came back to see [Appellant's daughter].

Officer Potter said that he read the statement to Appellant, and Appellant signed it. Corporal Roberson was present when Officer Potter read the statement to Appellant, and he witnessed the Appellant sign the statement. Officer Potter testified that he never told Appellant that he would be arrested unless he signed the statement. He further testified that the department's policy is to not immediately arrest the accused in these types of cases unless the investigator deems the accused to be a flight risk. Officer Potter did not think Appellant was a flight risk.

Finally, Officer Potter testified that he wrote only one statement and that Appellant never voiced any disagreement with it.

Corporal Roberson, who had been with the Rhea County Sheriff's Department for fourteen years, testified that he accompanied Officer Potter to Appellant's house. He witnessed Officer Potter read Appellant his Miranda rights and witnessed Appellant sign a waiver. Corporal Roberson testified that Appellant appeared to understand his rights and had no difficulty communicating with Officer Potter.

Corporal Roberson said that he was in another room with Mrs. Weaver when Officer Potter interviewed Appellant. Corporal Roberson could hear Officer Potter and Appellant talking, but he could not understand what was being said. He never heard the conversation get loud or argumentative.

Corporal Roberson returned to the kitchen at Officer Potter's request. He witnessed Officer Potter read Appellant's statement to Appellant. Appellant acknowledged that he made the statement and signed it. Corporal Roberson confirmed that the written statement matched the statement read by Officer Potter.

Appellant testified on his own behalf. He said that he and Ms. Weaver had been married for approximately eight years and that their daughter was adopted. He explained that their daughter's biological mother, Elizabeth Adkins, lived with them for a period of time.

Appellant testified that at the time of the alleged offense, he had a hernia and that he had to wear an eight-inch leather harness around his mid-section to hold his "private parts." He testified that the strap covered his penis and that the hernia prevented him from having sex.

Appellant said that on May 15, 2007, he was at his home preparing to mow the lawn. The victim and her brother came to his house. The victim approached Appellant holding a book. She sat down on Appellant's knee and "took [Appellant's] left hand and laid it down on her stomach or crotch whatever." Appellant "pushed her away" and told her, "somebody ort [sic] to talk to [her] mama." The victim ran over to a swing in Appellant's yard and played with her brother. Appellant considered calling the victim's mother to inform her about what had occurred, but he decided to first consult his wife. Because Ms. Weaver was not home at the time, he proceeded to mow the lawn. The victim's mother had already called Ms. Weaver when Appellant finished mowing the lawn.

Appellant testified that he spoke with Officer Potter and Corporal Roberson later that evening. According to Appellant, he told Officer Potter that he did not do anything improper

-4-

and maintained that the victim grabbed his hand. Appellant said that the statement introduced at trial was not accurate. He said that when Officer Potter first read the statement to him, Appellant refused to sign it because it was not accurate and did not reflect what he had told Officer Potter. Officer Potter informed Appellant that he had to sign a statement or he would be arrested. Appellant again refused to sign the statement Officer Potter presented, but he told Officer Potter he would sign a statement that accurately detailed his version of the events. Appellant signed a statement that he believed was consistent with his version of the events. However, because he could not read or write, he was unable to confirm the accuracy of the statement. He did not ask Ms. Weaver to review the statement. When asked whether he believed Officer Potter intentionally gave him the wrong statement, Appellant said he believed Officer Potter "made a mistake" and gave Appellant "the wrong paper to sign."

Appellant admitted that he might have had a beer that day. He denied getting a beer out of his truck and drinking it while the victim was at his house. He also denied watching the victim's house while she and her mother were speaking with the police.

Ms. Weaver testified that she and Appellant adopted their daughter when she was eight months old. The child's biological mother, Ms. Adkins, also lived with them for some time.

Ms. Weaver testified that the victim and her brother "practically lived" at their house for about six years. She said the victim was constantly at their house playing with their daughter.

On May 15, 2007, Ms. Weaver took her daughter, Ms. Adkins, and Ms. Adkins' child to an art show at the school. They were gone from 6:00 p.m. until 7:20 p.m. The victim and her brother were at the house when they left. Although the victim and her brother wanted to join them, Ms. Weaver told them they could not and instructed them to leave. The victim and her brother were still at the house when Ms. Weaver returned.

Ms. Weaver recalled that the police came to her house later that evening. Although she was not in the room during Appellant's conversation with Officer Potter, Ms. Weaver testified that the conversation got loud. She heard Appellant tell Officer Potter, "that's not what I told you." She also heard Officer Potter tell Appellant that he would take Appellant to jail unless he signed a statement.

Appellant's seven-year-old daughter was the next witness. She testified that after Appellant was charged, the victim told her that she made the allegations against Appellant "just for the fun of it." On cross-examination, she acknowledged telling a Department of

Children's Services (DCS) employee that the victim told her that Appellant had touched the victim inappropriately.

Susan Morgan, an employee of DCS, testified that she became involved in the case because of the nature of the allegations against Appellant. Ms. Morgan testified that Appellant told her that he was helping the victim with a puzzle, and she slid off of his knee. According to Appellant, the victim "was sliding off his leg and he grabbed her back up on his lap." Appellant said that he pulled the victim up by her "inner thigh."

After Ms. Morgan testified, the defense called a series of witnesses who testified to Appellant's reputation for truthfulness. Each witness had known Appellant for many years and claimed he had a good reputation.

At the conclusion of Appellant's proof, the State recalled Officer Potter. He testified that he explained the legal process to Ms. Weaver and informed her that DCS might investigate to determine whether the Weaver's daughter should be removed from the home. Officer Potter testified that Ms. Weaver told him that she never left their daughter home alone with Appellant.

The jury found Appellant guilty of the lesser-included offense of battery in count one but acquitted him of the charges alleged in counts two and three.

At sentencing, the trial court heard testimony from Appellant, Ms. Adkins, and Ms. Weaver.

Ms. Adkins testified that she was Appellant's step-granddaughter and that she lived in a trailer on Appellant's property. Appellant adopted one of her daughters.

Ms. Adkins testified that she began living with Appellant and Ms. Weaver when she was fourteen years old. When she was sixteen, she moved out after an argument with Ms. Weaver, but she came home for Thanksgiving that year. She recalled that on one occasion while she was at the Weaver's house, Appellant got into bed with her while she was sleeping. He thought she was another woman who was staying at the house. According to Ms. Adkins, Appellant got out of the bed immediately upon realizing she was not the woman he expected. Ms. Adkins acknowledged that she told a DCS worker that the Appellant knew she was in the bed and that he tried to touch her. She also told the worker that she tried to complain to Ms. Weaver, but Ms. Weaver refused to listen. Ms. Adkins testified that she lied about the incident to the DCS worker to try to regain custody of her daughter.

On cross-examination, Ms. Adkins acknowledged that she had a minimum-wage job and that she depended heavily on the Weavers. She also acknowledged that Appellant and Ms. Weaver had custody of her daughter and that they could prevent her from seeing the child. Ms. Adkins maintained that she did not fear that the Weavers would prohibit her from seeing her daughter.

Appellant testified that he told the truth during his trial testimony and reaffirmed that he had done nothing to harm the victim. He reiterated that the victim was the aggressor. He said that he had been diagnosed with throat cancer, but his health was improving and he hoped to return to work. Appellant stated that he had been employed his entire life and that he had been honorably discharged from the military. He denied he attempted to inappropriately touch Ms. Adkins. He admitted that he was involved in an altercation with his step-son while on bond in the instant case. He said that his step-son filed an aggravated domestic assault charge against him, but it was "no-billed" by the grand jury. Appellant maintained that his step-son was responsible for the altercation. He also admitted that he had a prior conviction for driving under the influence.

Ms. Weaver was the final witness. She denied telling Officer Potter that she did not allow her daughter to be alone with Appellant. She explained that DCS made her sign a statement saying that she would not let her daughter be alone with Appellant while they investigated the victim's allegations.

The presentence investigation report stated that Appellant characterized his health as poor. According to the report, Appellant said he drank two to three drinks occasionally. However, he said that he "last consumed alcohol in 2005" and that he quit drinking because he had a "good and happy life." Appellant said that he dropped out of school after the eighth grade to help on the family farm after his mother died. He joined the Army in 1962 and was honorably discharged in 1964. The presentence report does not list any employment information for the years between 1964 and 1999. However, the Appellant was employed at various jobs from 1999 until 2007.

At the conclusion of the hearing, the trial court sentenced Appellant to serve six months in the county jail, the maximum sentence allowed for a Class B misdemeanor. The trial court explained that it did not find Appellant credible and that he had refused to accept responsibility for his actions.

Appellant then filed this appeal challenging the length and manner of service of the sentence, arguing that he should not have been sentenced to confinement.

## II. Analysis

Appellate review of misdemeanor sentencing is de novo with a presumption of correctness even if the trial court failed to make specific findings on the record. See State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998). In misdemeanor sentencing the "trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute." Id. Thus, the trial court is afforded considerable latitude in misdemeanor sentencing. See, e.g., State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999). However, as this court explained in State v. Beck, the trial court must "enunciate whether [it] considered the sentencing principles and all relevant facts and circumstances." 950 S.W.2d 44, 47 (Tenn. Crim. App. 1997). The trial court retains the authority to place defendant on probation immediately or after a time of confinement. See Tenn. Code Ann. § 40-35-302(a). In sentencing a misdemeanor defendant, the trial court must fix a percentage of the sentence, not to exceed seventy-five percent, that the defendant must serve in confinement before being eligible for release into rehabilitative programs. See Tenn. Code Ann. § 40-35-302(d).

The evidence at trial demonstrated that Appellant inappropriately touched an eleven-year-old girl in an extremely offensive manner. The evidence also demonstrated that Appellant refused to accept responsibility for his criminal conduct. Appellant blamed the victim for the offense and claimed the police officers duped or coerced him into signing an inculpatory statement. In arriving at the Appellant's sentence, the trial court considered the nature of the offense, Appellant's lack of credibility, and his refusal to accept responsibility for his actions. We conclude that the trial court did not abuse its discretion in sentencing Appellant to six months in confinement.

We note, however, that the trial court did not assign a minimum percentage of time the defendant must serve before he becomes eligible for certain rehabilitative programs. See Tenn. Code Ann. § 40-35-302(d). By statute, "[i]f no percentage is expressed in the judgment, the percentage shall be considered zero percent (0%)." Id. Thus, we conclude that the percentage to serve is zero.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____

NORMA McGEE OGLE, JUDGE